## Case No. 16,777.

### UNITED STATES ex rel. HENDERSON v. WRIGHT.

[20 Leg. Int. 181; [1] 5 Phila. 299; 2 Pittsb. Rep. 440; 25 Law Rep. 459; 10 Pittsb. Leg. J. 305.]

Circuit Court, W. D. Pennsylvania. 1863.

ARMY — ENLISTMENT OF MINORS — DISCHARGE — PAROLED PRISONERS OF WAR—CARTEL FOR EXCHANGE OF PRISONERS—POWERS OF MILITARY OFFICERS.

1. As decided in [Case No. 16,778], the enlistment of minors *held* to be illegal in the absence of the consent of their parents or guardians.
[Cited in Re McDonald, Case No. 8,752; Re Davison, 4 Fed. 509, 21 Fed. 623; Re Chapman, 37 Fed. 330.]

2. A prisoner of war paroled by the enemy, although a minor, is not entitled to his discharge until after his exchange.

3. His father's claim to his services must be subordinated to the public exigency, to the higher claims of the nation.

4. The parole or promise given by the son, was for his good, for his liberty, and although a minor, it is binding upon him independent of public or political reasons.

5. The government of the United States, from motives of humanity, have been compelled to treat the present Rebellion as a public war, and to apply to it the rules of civilized warfare.

6. Paroles given by prisoners of war are of sacred obligation, and the national faith is pledged for their fulfillment.

7. Cartels, or military agreements, for the exchange of prisoners, made by the officer in command, are of such force, under the law of nations, that even the sovereign cannot annul them.

8. Good faith and humanity ought to preside over the execution of these compacts and which are designed to mitigate the evils of war, without defeating its legitimate purposes.

9. These cartels have all the binding power of treaties, which, under the sixth article of the constitution of the United States, are a part of the supreme law of the land.

10. When the minor is in an attitude to enable the government to comply with the cartel of their military officer, and the minor has been duly exchanged, the rights of the parent will be properly regarded.

[This was an application by Andrew Henderson for a writ of habeas corpus to be directed to Captain E. S. Wright, of the United

1 [Reprinted from 20 Leg. Int. 181, by permission.]

States army, for the purpose of procuring the release of an enlisted minor. The writ having been granted, the command thereof was obeyed by producing the body of the enlisted man in court.]

Mr. Keenan, for relator.
Mr. Carnahan, for the United States.

McCANDLESS, District Judge. If this case presented the single question as to the irregularity of the enlistment, the court would have little difficulty in deciding it. The fact of minority is established, and the right of relator to the services of his son is admitted. But grave considerations of a public character arise, to which all others of a domestic nature must be subordinated. The proofs show that John M. Henderson was enlisted in the month of August, 1861, in the 11th Pennsylvania regiment, Col. Coulter; that he was born on the 4th of August, 1843, and at the date of his enlistment, he was about eighteen years of age. He participated with this gallant regiment in the battle of Fredericksburg, was taken prisoner by the enemy in that bloody engagement. was removed to Richmond, and subsequently paroled. Upon his arrival within the United States lines, he was ordered to Camp Parole, at Annapolis, Maryland, from which he departed, without leave, and was recently arrested by a provost guard near his father's residence, in Westmoreland county. It appearing also that he was mustered into the service, without the consent, and against the wishes of his father, he would be entitled to his discharge, but for the reasons which the court will briefly proceed to assign.

The country is at war, and as the world acknowledges, "the greatest civil war known to the history of the human race." Although a rebellion, it has assumed such huge dimensions, with all the characteristics of a public war, that the government have been compelled, from motives of humanity, to treat it as such, and to apply to it the rules of civilized warfare. It has also been so recognized by the highest judicial authority of the country. As the supreme court of the United States say, in that great opinion recently delivered by my Brother Grier, in the Prize Cases [2 Black (67 U. S.) 666]: "The parties belligerent in a public war, are independent nations. But it is not necessary to constitute war, that both parties should be acknowledged as independent nations of sovereign states. A war may exist where one of the belligerents claims sovereign rights as against the other, who claims a right to renounce their allegiance, and are in rebellion against their sovereign. insurrection against a government may or may not culminate in an organized rebellion, but a civil war always begins by insurrection against the lawful authority of the government. A civil war is never solemnly declared, it becomes such by its accidents—the

number, power, and organization of the persons who originate and carry it on. When the party in rebellion occupy in a hostile manner a certain portion of territory, have declared their independence, have cast off their allegiance, have organized armies, have commenced hostilities against their former sovereign, the world acknowledges them as belligerents, and the contest a war. They claim to be in arms to establish their liberty and independence, in order to become a sovereign state, while the sovereign party treats them as insurgents and rebels who owe allegiance, and who should be punished with death for the treason. The laws of war, as established among nations, have their foundation in reason, and all tend to mitigate the cruelties and misery produced by the scourge of war. Hence the parties to a civil war usually concede to each other belligerent rights. They exchange prisoners, and adopt the other courtesies and rules common to public or national wars."

Belligerent rights, then, being conceded to the insurgents by both the executive and judicial departments of the government, let us see what is the usage and practice of nations as established by public law in cases of prisoners of war. Savage nations put them to death. During the wars of the middle ages a ransom was substituted. Only within the last century or two was the mild and humane system of exchange introduced among the polished nations of Christendom. Mr. Wheaton tells us in his volume of International Law (page 393), "that cartels for the mutual exchange of prisoners of war are regulated by special convention between belligerent states. according to their respective interest and views of policy. Sometimes prisoners of war are permitted by capitulation, to return to their own country, upon condition not to serve again during the war, or until duly exchanged. Good faith and humanity ought to preside over the execution of these compacts, which are designed to mitigate the evils of war, without defeating its legitimate purposes. Breach of good faith, in these transactions, can be punished only by withholding from the party guilty of such violation, the advantages stipulated by the cartel; or in cases which may be supposed to warrant such a resort, by reprisals or vindicative retaliation." And in Vatt. Law Nat. 354, we find that these cartels or military agreements, are held to be of sacred and of public obligation. A prisoner released on his parole, enjoys the comfort of passing the time of his captivity in his own country, in the midst of his family, and the party who have released him rest as perfectly sure of him as if they had him confined in irons. Such prisoners are dismissed on their parole—bound by promise not to carry arms for a certain time. or during the continuance of the war. And as every commander. necessarily, has a power of agreeing to the conditions on which the enemy

admits his surrender, the engagements entered into by him for saving his life or his liberty, with that of his men, are valid, as being made within the limits of his powers, and his sovereign cannot annul them. It follows that these cartels have all the binding power of treaties, which, under the sixth article of the constitution of the United States, are a part of the supreme law of the land.

This young man made a promise, for the fulfilment of which the national faith is pledged. It must be redeemed, or the national character is dishonored. Under the law of nations the president could not discharge him until his exchange, and what the president of the United States cannot do, will not be assumed by the judiciary. The relator must yield his natural and domestic claims to the public exigency, to the higher claims of the nation, and when his son is in an attitude to enable the government to comply with the cartel of their military officer, his rights, as a parent, will be properly regarded. This may save his son from the danger of immediate execution, should he in future, by his rashness or misconduct, fall into the hands of the enemy. The parole or promise he gave was for his good, for his liberty, and although a minor, it is binding upon him, independent of public or political reasons. 2 Kent, Comm. 269. As the regiment in which he fought was one of the most distinguished of the Pennsylvania line, and as this court is of opinion he is, by law, entitled to his discharge, after exchange, if there be no military accusation against him, we refer him favorably to the secretary of war.

John M. Henderson is remanded to the custody of the United States provost marshal, to be returned to Camp Parole, Annapolis, Md., there to await the orders of the war department for exchange as a prisoner of war, and the relator is ordered to pay the costs of this writ.